GLANDER, Administratrix, Appellant, vs. MILWAUKEE ELEC-
TRIC RAILWAY & LIGHT COMPANY, Respondent.

*December 9, 1913—January 13, 1914.*

*Electricity: Broken wire: Death of person: Contributory negligence.*

Where a broken or detached guy wire, charged with electricity,
was hanging near a pole, swaying and emitting flame or
sparks when it came in contact with the pole, a city fireman
who had been stationed there and told to keep away and keep
others away from the pole and wire, because it was danger-
ous, was, as a matter of law, guilty of contributory negligence
when, in an uncalled-for attempt to break down the wire, he
grasped it with his bare hand and received a shock which
killed him.

APPEAL from a judgment of the circuit court for Milwau-
kee county: F. C. ESCHWEILER, Circuit Judge. *Affirmed.*

Plaintiff brings this action to recover damages for the
death of her husband, who was a fireman of the city of Mil-
waukee. Death resulted from grasping a guy wire charged
with electricity. The wire in question had become broken
or detached, and hung suspended about eighteen inches dis-
tant from a wooden pole. It reached within five or six feet
of the ground. The wire in swaying back and forth from
the wind periodically touched the pole. The contact re-
sulted in the emission of sparks from the wire which burned
a small hole in the pole. The fire department was called by
telephone and responded to the call. In the meantime the
fire had been put out by boys throwing snow on it. After
the department arrived the wire continued to sway and to
emit a flame or sparks when it came in contact with the pole.

Captain Konz, who was acting as assistant chief on this
occasion, was the first member of the fire department to ar-
rive. He testified that he got there about three minutes
after he received the call. Lieutenant Murphy and his men
arrived a few seconds later. The deceased was a member of

this crew. Captain Konz further testified that he told Lieutenant Murphy to see that no one went near the post and that he would telephone the operator of the fire department to notify the street railway company to send a line wagon to make the necessary repair and to shut off the current. After telephoning, he advised the firemen to return to the stations, after directing Lieutenant Murphy to leave a detail of men to stay near the post to see that no one came in contact with it. He also said that he advised the firemen to keep away from the pole, and that he was advised by Murphy that he would leave the deceased to warn persons to keep away, and that he also told him 'to keep away from the pole. He also testified that he told his men to keep away from the wire and not to let any one come within five or six feet of the pole. Later he said that he was not sure that he specifically mentioned the wire, but that if any one kept away from the pole he would also keep away from the wire.

Lieutenant Murphy testified that the wire was electrified and that every time it touched the pole it would spit fire. Also that he detailed the deceased to stay there and guard the wire and not let anybody come in contact with it, and that he told him to stay until some one came and removed the wire and in the meantime to keep people away from it.

The witness Halazon was called by the plaintiff, and he testified that he was on the ground when the firemen came; that they (meaning either the captain or lieutenant or both) told deceased to keep people away from the pole, because it was dangerous for any one to go near it, and that the wire was still sparking when the department left and continued to spark after that.

There is practically no dispute as to what occurred thereafter. After waiting for about fifteen or twenty minutes the deceased took hold of the wire with his right hand, on which he was wearing a leather glove, and apparently backed

toward the sidewalk, in the meantime trying to break the wire down. The wire was of the size of a slate pencil and he was not successful. He then moved forward and grasped the wire with his left hand, which was bare, and received a shock which killed him almost instantaneously. The witness Killian testified that a woman living in the neighborhood told deceased not to touch the wire.

The evening was mild, the deceased had had his supper, and he was detailed to remain where he was stationed until the repair wagon came along. No reason is suggested why he did not, obey the instructions he had received or why he undertook to break a wire of the size of this one. There was no insulation on it whatever.

The following questions were propounded to the jury, to which they returned answers as indicated:

"(1) Did the defendant in placing the feed wire as it did on the pole at the corner of Eighth street and St. Paul avenue, fail to exercise ordinary care? *A*. Yes.

"(2) If you answer question number 1 'Yes,' then answer: Was such failure to exercise ordinary care in so placing the feed wire a proximate cause of Glander's injury? *A*. Yes.

"(3) Did the defendant fail to exercise ordinary care by not shutting off the circuit after notified by telephone of a crossed wire and before Glander was killed? *A*. Yes.

"(4) If you answer question number 3 'Yes,' was such failure to shut off the circuit a proximate cause of Glander's injury? *A*. Yes.

"(5) When left in charge of the post and wire was Glander warned by one of his superiors that the wire might be charged with electric current capable of producing injury to the person? *A*. No.

"(6) Would a person of ordinary care in the situation of Glander have learned before touching the wire that it was charged with electric current capable of producing injury to the person? *A*. No.

"(7) If you answer the foregoing question 'Yes,' ought

Glander in the exercise of ordinary care to have known at the time he took hold of the wire that such dangerous situation still existed?  A. ——.

"(8) Did any want of ordinary care on the part of Glander proximately contribute to his injury?  A. No.

"(9) What sum will compensate the plaintiff for the pecuniary loss she has sustained?  A. $2,750."

The court changed the three negative answers to "Yes," and answered question 7 in the affirmative, and on the verdict as changed rendered judgment for defendant.

The trial judge in disposing of the case said in reference to the deceased, among other things:

"His duty was to keep everybody away from the wire, not the wire from everybody.  If the wire was a danger to every-body, it was a danger to him, and he was clearly stepping outside of the line of his duty in undertaking to do that which he was directed to wait for some one else to do."

For the appellant there were briefs by *Rubin & Zabel*, attorneys, and *Horace B. Walmsley*, of counsel, and oral argument by *Mr. W. B. Rubin* and *Mr. Walmsley*.

For the respondent there was a brief by *Van Dyke, Rosecrantz, Shaw & Van Dyke*, and oral argument by *J. D. Shaw*.

BARNES, J.  The essential facts are embodied in the foregoing statement.  It would almost seem that it was obviously dangerous to the deceased, a man nearly twenty-six years of age who had passed a civil service examination, to take hold of this bare wire with his bare hand under the circumstances which were known to him.  It was constantly throwing out significant danger signals.  Be this as it may, he was warned to keep away and to keep others away from the pole and wire, because it was dangerous to come near them.  Counsel argue that the captain's warning related to the pole and not to the wire.  This we think is far fetched.  The lieutenant's instructions were specific and his evidence is not disputed.  Deceased could not keep a respectful distance from

the pole without keeping away from the wire also. The case is unfortunate and distressing, but the evidence of contributory negligence is clear; at least as clear as it was in *Billington v. Eastern Wis. R. & L. Co.* 137 Wis. 416, 119 N. W. 127.

*By the Court.*—Judgment affirmed.